## COMMONWEALTH *vs.* RICHARD R. DESROSIER.

No. 01-P-169.

Worcester. February 11, 2002. - November 1, 2002.

Present: MASON, COHEN, & MILLS, JJ.

*Practice, Criminal,* Plea. *Homicide.*

A Superior Court judge erred in allowing a criminal defendant, then under an indictment for murder in the first degree, to withdraw his plea of guilty to a charge of murder in the second degree, where the defendant's plea was intelligently made, and not infected with prejudicial constitutional error, in light of facts indicating that the defendant heard a detailed recitation of the evidence against him, and stated that he did not have any reason to doubt the veracity of the evidence; he acknowledged he had admitted killing the victim to numerous persons; he affirmed he had discussed possible defenses with his attorney; defense counsel testified he had discussed the evidence with the defendant, and they had "assessed everything"; and there was no suggestion that the defendant was not on notice of the charges contained in the indictment. [353-358]

INDICTMENT found and returned in the Superior Court Department on August 8, 1990.

A motion to withdraw a plea of guilty, filed on July 17, 1996, was heard by *Timothy S. Hillman,* J.

*Katherine E. McMahon,* Assistant District Attorney, for the Commonwealth.

*John M. Thompson* for the defendant.

COHEN, J. On February 5, 1991, the defendant, then under indictment for murder in the first degree, pleaded guilty to a charge of murder in the second degree in connection with the death of Karen Barriere. His plea was accepted by a judge of the Superior Court, after a colloquy in which the defendant stated that he had no reason to doubt that the crime occurred in the manner described by the prosecutor, even though he had no independent recollection of the killing because he had blacked out from alcohol consumption.

Approximately five years after he pleaded guilty, the defendant, acting pro se, filed a motion to withdraw his guilty plea. Following the appointment of counsel and assorted procedural steps, on November 7, 2000, a different judge (the plea judge having retired) allowed the defendant's motion to withdraw his guilty plea, on the ground that the defendant had not been properly informed of the elements of the charges against him, either by the judge who accepted the plea or by defense counsel. Before us is the Commonwealth's appeal from that order. We reverse the order allowing the defendant's motion.

1. *The plea hearing.* We begin by summarizing, in some detail, what transpired at the plea hearing. The judge began the colloquy by advising the defendant of the rights he would be waiving by tendering a plea of guilty. The defendant, a twenty-three year old high school graduate, acknowledged that he understood that he was waiving those rights, denied ever having received psychological treatment or being under the influence of any medication or substance that would impair his judgment that day, and stated that no one was forcing him to plead guilty.

After being told by the judge that the sentence for murder in the second degree was prescribed by statute, the defendant confirmed that he had discussed the sentencing consequences of his plea with his attorney, including the difference between the sentences for murder in the first and second degrees with respect to parole eligibility. He also confirmed that he and his lawyer had discussed the evidence that the Commonwealth would use if there were a trial and that he had "gone over with [his] lawyer the defenses [he] could raise and the other things [he] could do if [he] had a trial." He affirmed that he and his lawyer had discussed "the pros and cons of having a trial, as opposed to entering a plea of guilty," and that he was satisfied with his lawyer.

In response to the judge's request, the prosecutor then recited at length the evidence upon which the Commonwealth would rely if the case went to trial. In the late afternoon of April 16, 1990, the defendant and another man, Timothy Mosher, met two young women, a juvenile and the victim, Karen Barriere, in downtown Worcester. The foursome pooled their money and purchased two large bottles of beer and one-half gallon of

vodka. They then climbed up to the roof of Union Station, an abandoned railroad depot, where they consumed all of the beer and much of the vodka.

The four split into couples, with Mosher and the juvenile moving to a different area of the roof where they could not see or hear the defendant and Barriere. After a while, Mosher came back to check on the defendant and Barriere. The second time he did so, the defendant told him, "Don't come near here." Mosher approached anyway and saw Barriere, lying unclad, with her upper torso and face engulfed in flames. Mosher noticed that Barriere's chest was heaving up and down "as if in convulsions."

Mosher screamed, "Richard, what the fuck?" The defendant replied, "She's dead. She wouldn't fuck me, so I killed her. I have done this once before. Don't rat on me. Don't fuck me or you're fucked." Mosher turned away and fled. He took the juvenile home without telling her what he had witnessed and unsuccessfully attempted to call two Worcester police officers of his acquaintance.

Mosher then telephoned his girlfriend, who came by to pick him up. They encountered two police officers and informed them of what happened. Mosher brought the officers to the scene, where they found Barriere's body on the lower level of the roof. The body had been thrown from an opening in the roof's upper level to a concrete area, nineteen feet below.

At about the same time, Jason Robinson, an acquaintance of the defendant, was waiting for a bus across from Worcester city hall when he saw the defendant. Robinson asked the defendant how he was, to which the defendant responded, "not too good." Robinson noticed that the defendant's hands and denim jacket were covered with blood and asked him if he had been in a fight. The defendant replied, "I killed somebody." Robinson asked whether the defendant had disposed of the body. The defendant answered, "I burnt her. I burnt her. I burnt her." He added that he was going to a bar and that he "just had to tell somebody, but don't you fuck me. Don't you fuck me."

The defendant next visited an apartment up the street, where he met Ralph Mayotte and Louis Rome. Mayotte saw reddish smudges on the defendant's hands, jacket and trousers, and as-

sumed that the marks were paint. He also saw what he thought was soot on the defendant's clothing. The defendant was carrying a large bottle of liquor, either vodka or gin, that was one-third full. The defendant kept rubbing his hands together, saying, "I have blood on my hands, and it's not mine." The defendant then told Mayotte that he had "just killed someone." The defendant asked Rome if he, the defendant, could use the bathroom to wash away the blood and also asked if Rome had any "grass" so he could "get high." The defendant, "very cold, without any emotion," again said that he had just killed someone.

Within three hours of the murder, the police spoke with the defendant. He denied killing Barriere, explaining that he and the others had left her on the roof. He also stated that he had no idea how his clothing came to be covered with blood. After obtaining the defendant's consent, the police took the defendant's clothes and had them tested. The laboratory reported that the blood on the clothes was not his and that there was a ninety-four percent probability that it was Barriere's. Scrapings taken from beneath the defendant's fingernails tested positive for the presence of human blood.

An autopsy of Barriere revealed that she had a blood alcohol reading of .20. The medical examiner determined that she died as a result of blunt trauma, thermal injury to her head and neck, and smoke inhalation. Barriere's facial features were burned beyond recognition. Her identity was confirmed through her fingerprints.

After hearing this recital by the prosecutor, the defendant was questioned further by the judge. The defendant acknowledged that he had heard this evidence before at the probable cause hearing and that he understood that this proof would be available to be used if there were a trial of the case. The judge then asked the defendant, "What recollection do you presently have of the events of this night?" The defendant answered, "None." The judge probed further: "You do realize that during the course of that night you did make statements to witnesses in which you described various aspects of what occurred?" The defendant asked the judge to repeat the question. The judge asked, "Do you know that during that night you made the statements that

were described by these various witnesses as to what happened?" The defendant responded, "Yes." The judge then inquired, "Do you have any reason to doubt that the killing occurred in the manner that was described?" The defendant answered, "No." The judge asked, "But you had a blackout, is that it?" The defendant responded, "Correct. Yes."

The judge then asked whether the defendant understood that, by pleading guilty, he was waiving his right to pursue a motion to suppress evidence. He also asked whether the defendant recognized that he was waiving his right to have the Commonwealth prove its case beyond a reasonable doubt to a jury. Finally, the judge inquired whether the defendant understood that at a trial, the Commonwealth would have to prove that the defendant voluntarily made the statements attributed to him. The defendant answered affirmatively to all of these questions.

The plea hearing judge found that there was a basis in fact for the charge to which the defendant would enter a guilty plea and that his plea would be free, voluntary, and made with an understanding of the rights being waived. The defendant again expressed his desire to plead guilty to murder in the second degree and, after inquiry by the clerk, entered such a plea.

The judge then asked defense counsel whether it was true that the defendant had a long history of alcoholism that was consistent with his statement that he had blacked out. "In other words, he has amnesia for what occurred, even though he may very well — and I assume and find that he was aware of the events at the time that they occurred?" Defense counsel answered, "That's correct," explaining that the defendant recalled some aspects of the day in question, i.e., going to Union Station, passing out at some point and then being at home. Defense counsel added that the defendant had reviewed all of the police reports in his case, had attended the two-day probable cause hearing and had reviewed a transcript of that hearing. The plea hearing concluded with the judge sentencing the defendant to a life term of confinement in State prison.

2. *Defendant's motion to withdraw guilty plea.* The defendant's motion to withdraw his guilty plea rested upon four grounds: that newly discovered evidence cast doubt on his guilt; that his trial counsel was ineffective; that his waiver of Miranda

rights was not voluntary or intelligent; and that his guilty plea was not made knowingly, freely, and voluntarily because he had not been informed sufficiently about the elements of murder in the first or second degree. After a hearing, the motion was allowed solely on the last ground,[1] because the motion judge was of the opinion that, contrary to the dictates of the recently decided case of *Commonwealth* v. *Nikas*, 431 Mass. 453 (2000), the record did not establish "that the defendant was ever specifically informed of the elements of murder in the first or second degree, including the requisite level of intent needed to commit such crimes."

Among the witnesses called by the defendant at the hearing was the defendant's trial counsel, an experienced criminal defense attorney who was on the court-appointed murder list when he represented the defendant. Counsel testified that when he was preparing the case he understood that the prosecutor could have argued alternative grounds in support of a conviction for murder in the first degree: extreme atrocity and cruelty; murder in the commission or attempted commission of a felony, namely rape; or, perhaps, premeditated murder based upon the fact that the victim had been beaten up on the roof and dragged to an opening before being thrown to the lower level nineteen feet below. When asked whether the availability of these theories to the prosecution was a large consideration "in any advice you had to give the defendant, especially when it came down to the plea of guilty," he responded, "we talked — all we reviewed is the — all the police reports, with the investigation I had done, the main witness, again, was Mr. Mosher, and there were three or four other witnesses . . . . The probable cause hearing was two days. The autopsy reports, all the reports. We assessed everything, and we discussed it."

3. *Discussion.* A judge may allow a motion to withdraw a

---

[1]As we have stated, initially, the defendant's motion to withdraw his guilty plea was filed pro se. Later, after counsel entered an appearance, not all grounds were pressed. Because no evidence was presented or argument made at the hearing about the ineffective assistance or Miranda issues, the motion judge considered those claims to have been waived. The newly discovered evidence claim was considered and rejected by the motion judge because the new evidence consisted largely of unsubstantiated hearsay that tended, at most, to cast Mosher in a negative light but did not exculpate the defendant.

plea only "if it appears that justice may not have been done." Mass.R.Crim.P 30(b), 378 Mass. 900 (1979). Judges are to "apply the standard set out in Mass.R.Crim.P. 30(b) rigorously," and should allow a postsentence motion to withdraw a plea only "if the defendant comes forward with a credible reason which outweighs the risk of prejudice to the Commonwealth." *Commonwealth* v. *DeMarco*, 387 Mass. 481, 484-487 (1982) (footnote omitted). As a matter of constitutional due process, a guilty plea may be nullified if it does not appear affirmatively that the defendant entered the plea freely and voluntarily. See *Commonwealth* v. *Robbins*, 431 Mass. 442, 449 (2000), citing *Boykin* v. *Alabama*, 395 U.S. 238, 242-243 (1969). Among other things, the plea record must demonstrate either that the defendant was advised of the elements of the offense or that he admitted facts constituting the unexplained elements.[2] See *Commonwealth* v. *Robbins, supra*, citing *Henderson* v. *Morgan*, 426 U.S. 637, 646 (1976).

In this case, although the defendant stated that he did not have "any reason to doubt" the killing occurred in the manner that was described by the prosecutor, and although the defendant could remember events before and after the killing, the defendant did not expressly affirm the facts constituting the crime. The defendant therefore equates his plea with an *Alford* plea,[3] see *North Carolina* v. *Alford*, 400 U.S. 25 (1970), even though it was not specifically so designated. On that basis, he argues that the validity of his plea turns upon whether he was informed of the relevant legal framework, which, in the case of

---

[2] The plea record also must demonstrate that the defendant was informed on the record of the constitutional rights that are waived by guilty plea and that the plea was voluntary and not in response to threats or undue pressure. *Commonwealth* v. *Robbins*, 431 Mass. 442, 449 (2000).

[3] As explained in *North Carolina* v. *Alford*, "while most pleas of guilty consist of both a waiver of trial and an express admission of guilt, the latter element is not a constitutional requisite to the imposition of criminal penalty. An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." *North Carolina* v. *Alford*, 400 U.S. 25, 37 (1970). See *Huot* v. *Commonwealth*, 363 Mass. 91, 95 & n.4 (1973). "Typically, a defendant makes an *Alford* plea to a lesser charge, or for the purpose of obtaining a lesser sentence, when the State's evidence is strong." *Commonwealth* v. *Nikas*, 431 Mass. 453, 455 (2000).

an *Alford* plea, means receiving an explanation of the nature of the crime of which he was accused as well as the nature of the crime to which he pleaded guilty. See *Commonwealth* v. *Nikas, supra* at 457-458.

Unquestionably, whether the defendant's plea was a true *Alford* plea or not, it would have been preferable had the plea hearing judge explained the elements of murder in the first and second degrees at the plea hearing. However, "[i]t does not matter whether a defendant acquires an understanding of the elements of the relevant crime or crimes from the judge, from his attorney, or in some other way. All that is necessary is that the record show that, by some means, the defendant possessed enough comprehension to plead 'freely and understandingly.' " *Id.* at 457, quoting from *Commonwealth* v. *Foster*, 368 Mass. 100, 102 (1975). We conclude the record demonstrates the defendant did, in fact, plead freely and understandingly.

After first acknowledging that he and his lawyer had "discussed . . . what he has been informed the Commonwealth would use as evidence against you," the defendant answered affirmatively when asked, "Have you also gone over with your lawyer the defenses you could raise and the other things you could do if you had a trial?" The defendant also responded "yes" to a third question: "Have you discussed with your lawyer the pros and cons of having a trial, as opposed to entering a plea of guilty?" We disagree with the motion judge's conclusion that this portion of the colloquy was legally insufficient to establish that counsel had advised the defendant of the elements of murder in the first and second degrees and, more particularly, of the requisite level of intent needed to commit such crimes.

Any discussion of "defenses" would have taken place against the backdrop of the indictment, which charged that the defendant "did assault and beat one Karen Barriere, with intent to murder her, and by such assault and beating did kill and murder the said Karen Barriere." Thus, the defendant, who makes no claim that he was not personally served a copy of the indictment pursuant to G. L. c. 277, § 65, had notice that the crime charged included the element of intent to murder. Cf. *Commonwealth* v. *Wiswall*, 43 Mass. App. Ct. 722, 723 (1997). Furthermore, as a

matter of common sense, a discussion of "defenses" and the "pros and cons of having a trial" would not have taken place in isolation from other pertinent legal information. Such a discussion almost certainly would have referred to the elements of the crimes to which the defenses would be advanced; and, in the context of these particular murder charges, a discussion of "defenses" would have included advising the defendant as to the potential legal significance of his voluntary intoxication at the time of the killing and its bearing on issues such as premeditation and extreme atrocity or cruelty.

This conclusion is buttressed by the testimony of trial counsel at the hearing on the defendant's motion.[4] Counsel's testimony was that he considered the various theories that were available to the Commonwealth in prosecuting the defendant for first degree murder and that, when he advised the defendant, "We assessed everything, and we discussed it." The import of counsel's testimony is that he discussed the case with the defendant, including defenses and the advisability of pleading guilty to a lesser charge of murder in the second degree, within the context of the prosecution's likely theories of guilt.

In this and other respects this case is significantly different from *Commonwealth* v. *Nikas, supra,* upon which the defendant heavily relies. The defendant in *Nikas* was indicted for murder in the first degree, but entered an *Alford* plea to murder in the second degree, because of the prosecution's strong case against him. Several years later, he filed a motion to withdraw his guilty plea, contending that he had not been informed sufficiently of the elements of murder in the first degree. The plea hearing judge allowed Nikas's motion, and the Supreme Judicial Court affirmed.

There are, however, significant distinctions between the present case and *Nikas.* In *Nikas,* the Commonwealth contended that Nikas intentionally shot the victim, but Nikas contested that

---

[4]It was the defendant who called trial counsel as a witness, and no objection was taken when the Commonwealth cross-examined him on his understanding of the case and his advice to the defendant. Cf. *Commonwealth* v. *Swift,* 382 Mass. 78, 84-85 (1980) (where defendant challenges a plea with allegations outside the record of the plea hearing, the Commonwealth may also rely on material outside the record, including the testimony of defense counsel).

fact, maintaining at the plea hearing that the killing was accidental. See *Nikas, supra* at 454. Still, he proceeded to enter an *Alford* plea to a charge of murder in the second degree, in light of the considerable evidence against him. See *id.* at 455. The record indicated that the defendant and his counsel had discussed only the Commonwealth's evidence and had no conversation whatsoever about the applicable law. See *id.* at 458. Indeed, during the plea colloquy, Nikas admitted his lack of understanding of the law, leading to an explanation by the plea hearing judge that misstated the elements of murder in the first degree. See *id.* at 459.

In contrast with *Nikas,* the defendant here did not dispute any of the facts evincing his guilt. Moreover, those facts, as developed at the probable cause hearing and as recited by the prosecutor, included all of the necessary elements of murder in the first and second degrees. The defendant also affirmed that he "kn[e]w that during the night [he] made the statements that were described by these various witnesses as to what happened." Thus, unlike *Nikas,* the record here reflects that the defendant was satisfied from his understanding of the Commonwealth's evidence and from his knowledge of what took place after the incident that he must have committed the crime. Finally, there is no suggestion that the defendant, like Nikas, received erroneous instructions or advice on the elements of murder in the first and second degrees. To the contrary, it is evident here that experienced trial counsel reviewed not only the evidence, but also possible defenses in light of the prosecution's likely theories of guilt.

In sum, the defendant heard a detailed recitation of the evidence against him, and stated he did not have any reason to doubt the veracity of that evidence; he acknowledged he had admitted killing Barriere to numerous persons; the defendant affirmed he had discussed possible defenses with his attorney; defense counsel testified he had discussed the evidence with the defendant, and they had "assessed everything"; and there is no suggestion that the defendant was not on notice of the charges contained in the indictment. See G. L. c. 277, § 65. On these facts, we cannot conclude that "justice may not have been done." Mass.R.Crim.P. 30(b). Rather, we conclude that the

defendant's plea was intelligently made, and not infected with prejudicial constitutional error. Accordingly, the judge's order allowing the defendant's motion to withdraw his guilty plea shall be reversed.

*Order allowing motion to withdraw guilty plea and for new trial reversed.*