Lowy, David A., J.
On May 9, 2011, the defendant, Emmanuel Baez (“Mr. Baez”), pleaded guilly to trafficking cocaine in an amount of fourteen grams or more, G.L.c. 94C, §32E(b), and possession of a class B substance with intent to distribute, G.L.c. 94C, §32A(a). Before the Court is the defendant’s motion to withdraw guilty plea.[1] The Motion cites as grounds: (1) the recently discovered misconduct of Annie Dookhan (“Ms. Dookhan”),[2] a chemist at the William A. Hinton State Laboratory in Jamaica Plain (“the Lab”), whose initials appear on paperwork for one of the drug samples associated with Mr. Baez’s case; and (2) alleged mismanagement and other problems at the Lab.[3] At a hearing held on May 23,2013, the Court accepted stipulated exhibits and heard testimony of the Commonwealth’s witness, Della Saunders (“Ms. Saunders”).
Upon review of the record, the hearing transcript, and the parties’ oral arguments, the motion is DENIED.
BACKGROUND
The following facts are taken from the record. Further facts are reserved for discussion.
I. The Underlying Charges
The pending indictments followed the execution of a search warrant at 8 Pickman Road in Salem, Massachusetts (“House”) on November 24, 2009. (See Ex. 21; Def.’s Mot. Ex. 2.)
After obtaining the search warrant, Detective Eric Connolly (“Detective Connolly”) and other members of *296 the Salem Police Department (collectively “officers or police”) set up surveillance near the House to monitor activity in the area and determine whether Mr. Baez was in the House. (Ex. 21 at 2.) Detective Gaudet observed Mr. Baez leave the House, and Detectives Doyle and Brennan approached him and identified themselves as police. (Ex. 21 at 2.) Mr. Baez turned away from the detectives in an attempt to flee and struggled when the detectives tried to stop him. (Ex. 21 at 2.) During the struggle, Mr. Baez placed an object into his mouth. (Ex. 21 at 2.) The detectives and other assisting officers tried to remove the item, but Mr. Baez refused to comply with commands to stop resisting and to spit out the item. (Ex. 21 at 2.) Sergeant Hanson then sprayed Mr. Baez with pepper spray, causing him to spit out a large plastic bag containing a white chunk believed to be cocaine. (Ex. 21 at 2.) The police seized the bag of suspected cocaine, and later sent it to the Lab for testing. (Ex. IB; Ex. 20; Ex. 21 at 2-3.) The police also seized other items from Mr. Baez, including: two cell phones; a wallet with identification; and forty-seven dollars in cash. (Ex. 21 at 2-3.)
The detectives then went to the House to execute the search warrant. (Ex. 21 at 3.) Detective Connolly knocked on the front door, and the homeowner, Joseph Lafaso, answered the door. (Ex. 21 at 3.) The police secured Mr. Lafaso in the living room, and began their search. (Ex. 21 at 3.) Lieutenant Thomas Cote, of the Essex County Sheriff Department K9 Unit, joined the search with the assistance of a drug-sniffing dog. (Ex. 21 at 3.) The dog alerted that narcotics were present in Mr. Baez’s bedroom closet. (Ex. 21 at 3.) The detectives searched the closet and found nine small white pills in a plastic zip lock bag, and two black boxes. (Ex. 21 at 3.) One of the boxes contained $1,206 in cash, and the other contained six plastic twists of a white powdery substance believed to be cocaine. (Ex. 21 at 3.)
Detectives found the following items in Mr. Baez’s bedroom: drug records and/or numbers {Def.’s Mot. Ex. 2); two cell phones; personal papers in Mr. Baez’s name; approximately $100 in change; assorted men’s and women’s gold jewelry; and one replica Air Soft Smith & Wesson M&P .40 caliber handgun 'without a red plastic tip. (Ex. 21 at 3.) Mr. Lafaso confirmed that the bedroom where those items were found belonged to Mr. Baez, and that Mr. Baez frequently came and went at all hours of the night. (Ex. 21 at 3.)
Under Mr. Lafaso’s bed, the police found a Mossberg Model 9200 twelve-gauge shotgun, and a Ruger rifle .44 mag. with assorted ammunition. (Ex. 21 at 3.) In the basement, the police found items used in street level distribution of cocaine, including cutting agents and packaging materials such as cut and uncut plastic bags and razor blades. (Ex. 21 at 3; Def.’s Mot. Ex. 2.) The police seized the above items from the House, and later submitted the six twists of suspected cocaine to the Lab. (Ex. 1A; Ex. 21 at 2.)
A grand jury indicted Mr. Baez on November 24, 2009 for: (1) trafficking in cocaine in an amount of twenty-eight grams or more, G.L.c. 94C, §32E(b) (indictment 2010-075-001); and (2) possession of a Class B substance (cocaine), G.L.c. 94C, §32A(a) (indictment 2010-075-002). (Dkt. ##l-2.)[4] Pursuant to a negotiated plea agreement with the Commonwealth, Mr. Baez pleaded guilty to indictment 2010-075-002 as charged. (Dkt. # 24-26.) As part of the plea, the Commonwealth entered a partial nolle prosequi to so much of indictment 2010-075-001 as alleged trafficking over fourteen grams (Dkt. #1), and Mr. Baez pleaded guilty to the reduced charge of trafficking cocaine in an amount of fourteen grams or more, G.L.c. 94C, §32E(b). (Dkt. #24-26.) Mr. Baez received a sentence of three years to three years and a day on the trafficking charge and a concurrent sentence of three years to three years and a day on the possession charge. (Dkt. ##26-27.)
II. Drug Testing Procedures at the Drug Lab
At the hearing, the Court heard the testimony of Ms. Saunders, who tested the substances in Mr. Baez’s case as the confirmatory chemist. (See Ex. 1A; Ex. IB.) Ms. Saunders worked at the Lab for twenty-seven years, and was a Chemist III at the Lab in December 2009 and February 2010, when the suspected drugs in Mr. Baez’s case were tested. (Hr’gTr. 31:21-24, 8:23-9:9; Ex. 1A; Ex. IB.) As a Chemist III, Ms. Saunders had a variety of different responsibilities, including those of a primary chemist, a confirmatory chemist, and an evidence officer. (Hr’gTr. 9:2-11.) Her testimony, which the Court credits, revealed the following facts concerning the procedures the Lab followed in handling and testing drug samples, as well as the roles of evidence officers, primary chemists, gas chromatogram mass spectrometer (“GC/MS”) GC/MS operators (hereinafter “GC/MS operators”), and confirmatory chemists.
A. The Evidence Officer
Law enforcement agencies submit substances to be tested to the Lab’s evidence office. {Hr’gTr. 11:25-12:5.) The submission is also accompanied by a drug receipt. (Hr’gTr. 12:5-10.) The drug receipt contains information such as: the name of the submitting agency, city or town; the name of the submitting officer; and a description of the substance submitted. (Hr’gTr. 12:7-10.)
The evidence officer who receives the sample assigns it a unique lab number, and initials and dates the drug receipt. (Hr’g Tr. 12:17-19.) The evidence officer then enters the information on the drug receipt into a computer, which generates an evidence control card. (Hr’g Tr. 12:20-22.) The evidence control card (“control card”) contains information such as: the specific sample(s) submitted and its gross weight; how the sample was submitted (e.g., in a paper bag or plastic bag); the number of samples submitted; the name of the submitting agency and submitting officer; the date of the submission; and the lab number. (Hr’gTr. 12:20-25; 13:2-6.) The evidence officer then places the submitted sample and the control card into a manila envelope, *297 which is kept in the evidence safe until the sample is assigned to a primaiy chemist. {Hr’g Tr. 13:9-12.) Primaiy chemists inform the evidence officer when they are available to take on work. (Hr’g Tr. 9:16-22.) The evidence officer then assigns samples to a primaiy chemist for preliminary testing. (Hr’g Tr. 9:16-22.)
B. Preliminary Testing Procedures— The Primaiy Chemist
The primaiy chemist signs out the sample and the control card, and keeps them in a locker that can only be accessed by that particular primaiy chemist and the lab supervisor. (Hr’gTr. 9:16-23; 13:9-15.) The primaiy chemist weighs and performs preliminary tests (e.g., color tests or instrumental tests) on the substance. (Hr’g Tr. 9:22-24.) She then records her initials, preliminary findings, the net weight of the sample, and other relevant information on the control card. {Hr’g Tr. 14:8-11.)
The primaiy chemist then prepares a small sample of the substance for confirmatory testing. (Hr’gTr. 9:24-25; 10:1-10.) First, the primaiy chemist puts an aliquot, or small amount, of the sample into a small glass vial and fills it with methanol, a reagent. (Hr’gTr. 10:4-10.) She then seals the top of the vial with crimpers, which are made of hard rubber.[5] (Hr’gTr. 10:6; 47:21-48:1.) After marking the vial with the lab number, the primaiy chemist submits the vial, the control card, and a mass spec control sheet to the GC/MS section of the Lab (“GC/MS lab”) for confirmatory testing. (Hr’g Tr. 10:7-10.) The rest of the sample (hereinafter referred to as “the bulk sample”), the portion that the primaiy chemist did not place into the vial, remains in the custody of the primaiy chemist for the remainder of the testing process. {Hr’gTr. 10:16-22.)
C. Confirmatory Testing Procedures— The GC/MS Machine, Confirmatory Chemists/GC/MS operators, and Confirmatory Testing
1.The GC/MS Machine
The GC/MS, a machine located in the GC/MS lab, is used to confirm the test results of the primaiy chemists. (Hr’g Tr. 10:15.) The GC/MS is capable of holding up to one hundred vials and consists of two sections: the gas chromatogram section (“the GC”) and the mass spectrometer section (“the mass spec”). (Hr’g Tr. 10:7-10; 14:24-25; 33:4-5; 34:16-18; 23-24.) The injection port of the GC contains a needle, which draws into the injection port some of the liquid contained in a particular vial. (Hr’g Tr. 33:10-15.) The liquid is then heated up and changed to gas. (Hr’g Tr. 33:19.) The gas travels through the column and into the mass spec. (Hr’g Tr. 33:20-24.) The mass spec bombards the gas molecules with energy, which breaks the molecules apart. (Hr’g Tr. 34:1-6.) The GC/MS generates printouts, which the confirmatory chemist then analyzes. (Hr’gTr. 34:1-6.) These printouts contain data such as “peaks” and the amount of time the sample spends in the GC, and the fragmentation pattern of the broken molecules. (Hr’g Tr. 34:7-15.) They also contain the initials of the chemist who operated the GC/MS, i.e., the GC/MS operator. (See, e.g., Ex. 7.)
2.Confirmatory Chemists/GCMS GC/MS operators
Confirmatory chemists, or GC/MS operators[6] are usually assigned to the GC/MS lab in one-or two-week rotations. (Hr’g Tr. 14:12-25.) Their responsibilities include: setting up GC/MS runs; operating the GC/MS; and confirming the test results of the primaiy chemist. (See Hr’gTr. 9:4-10.) Although the GC/MS operator who sets up the run on the GC/MS is often the same person who analyzes the resulting data for all of the vials on that run, this is not always the case. (See Hr’gTr. 20:22-21:8.) When the police department submits drug samples to the Lab on different dates, but those samples relate to the same defendant, the evidence officer assigns the later-submitted samples to the same primaiy chemist and GC/MS operator who analyzed the first sample related to that defendant. (Hr’gTr. 20:1-5.)
If the original GC/MS operator is not assigned to the GC/MS lab when the primaiy chemist passes the sample on to the GC/MS lab, the primaiy chemist makes a notation on the mass spec control sheet for the chemist who is, at that time, assigned to the GC/MS lab to have the original GC/MS operator analyze this particular sample. (Hr’gTr. 20:22-21:8.) In this situation, the only role of the assigned GC/MS operator concerning this sample is to set up the GC/MS and place the vial on the run. (Hr’gTr. 28:11-17.)
3.Setting Up the GC/MS Run
Before each run, the GC/MS operator conducts two tests to ensure that the GC/MS is functioning properly. {Hr’gTr. 38:9-17; 40:16-17.) To check the GC, the GC/MS operator prepares a Quality Control Mixture (“QC Mix”), a mixture of cocaine and codeine, and runs it on the GC/MS. (Hr’g Tr. 37:15-19.) She then compares the resulting data to the standard data in known literature. {Hr’gTr. 38:9-17.) If the GC data for the QC Mix does not match the data reflected in the literature because the substance that is supposed to be a known standard is actually a different substance or because there is a problem with the machine, the information from that run is not used. (Hr’g Tr. 44:5-22.)
To check the mass spec, the GC/MS operator performs what is called a “tune test,” which generates data on a tune report. {Hr’g Tr. 40:15-22.) If the data falls within certain parameters, the mass spec is working properly. {Hr’gTr. 40:19-21.) If it does not, the GC/MS is taken off-line for repair. (Hr’gTr. 40:21-22.)
4.Confirmatory Testing
After receiving the vials of samples from the primaiy chemist (“evidentiaiy samples”), the GC/MS operator checks the information on the mass spec control sheet from the primaiy chemist. {Hr’gTr. 35:11-13, 24-37:1.) The GC/MS operator checks the vials, and sends back any that appear out of order or tampered with. (Hr’g Tr. 49:10-16.) She then places the evidentiaiy samples onto *298 the GC/MS. (Hr’g Tr. 35:12-13, 24-37:1.) Each run contains the evidentiary sample, a vial containing a known standard for the drug being tested (e.g., cocaine), as well as blank vials (“blank” or “blanks”).[7] (Hr’g Tr. 35:12-25-37:1.) Blanks and known standards are used to determine whether the GC is functioning properly. (Hr’g Tr. 35:15-17.) After the run is completed, if the GC/MS printout shows that there are traces of a substance in a blank, then substances from a previous sample have “carried over” into the blank. {Hr’g Tr. 15:10-16:3.) In that case, the GC/MS operator places any vials following the sample that was “carried-over” onto a new run, and writes on the control card the run number and the reason for the re-run. (Hr’gTr. 15:10-16:3.)
If no carry-over is detected, the GC/MS operator, now acting in a confirmatory role, takes the printout generated by that GC/MS run, and compares the mass spec data for the evidentiary sample with the mass spec data for the known standard. (Hr’g Tr. 34:11-15.) Matching data indicates that the evidentiary sample is the same substance as the known sample. (Hr’g Tr. 34:11-15.) The GC/MS operator records this finding on the control card and returns it to the evidence office. (Hr’gTr. 26:24-27:2.) If, however, the mass spec data indicates that the evi-dentiary sample is too weak, too strong, or different from the primary chemist’s findings, the GC/MS operator writes her findings, initials, the date, and the notation “RTC” (Return to Chemist) on the control card. (Hr’g Tr. 16:17-20.) The GC/MS operator then returns the sample and accompanying paperwork to the primary chemist, who performs further testing and submits a new vial to the GC/MS lab. (Hr’gTr. 16:17-22.)
If there is a vial on the GC/MS run that is supposed to be analyzed by a confirmatory chemist other than the GC/MS operator, the GC/MS operator analyzes all of the other samples first. (Hr’gTr. 28:11-17.) She then shows the original confirmatory chemist where the vial was placed on the GC/MS. {Hr’g Tr. 28:14-22.) The original confirmatory chemist looks at the vial and its placement on the GC/MS, takes the related paperwork from the GC/MS operator, analyzes the data on the GC/MS printouts, and records her findings. (Hr’g Tr. 28:14-29:5.) Notwithstanding the participation of the confirmatory chemist and/or GC/MS operator, only the primary chemist is credited on Lab data reports[8] as having analyzed that sample. (Hr’gTr. 27:14-19; 51:1-6.)
III. The Samples in this Case
A. Sample IB
On December 2, 2009, the Lab received for testing the plastic bag of suspected drugs seized from Mr. Baez’s person (hereinafter referred to as “Sample IB”). (Ex. IB.) Primary chemist, Kate Corbett (“Ms. Corbett”) and confirmatory chemist, Ms. Saunders, analyzed Sample IB on December 14, 2009. (Ex. IB.) Their findings were reported on drug certificate number B09-16530. (Ex. IB.) This certificate states that the substance had a net weight of 31.45 grams and “contained]: Cocaine, a derivative of Coca leaves, as defined in Chapter 94C, Controlled Substance Act, Section 31, Class B.” (Ex. IB.) Ms. Dookhan’s signature does not appear on drug certificate number B09-16530, and there is no evidence in the record that Ms. Dookhan was involved in the testing or analysis of Sample IB. (See Ex. IB.) The Commonwealth based the trafficking charge against Mr. Baez on Sample IB.
B. Sample 1A
Later, on February 5, 2010, the Lab received another sample relating to Mr. Baez—the six plastic bags of suspected drugs seized from the House (hereinafter referred to as “Sample 1A”) (Ex. 1A). Ms. Corbett analyzed Sample 1A on May 13, 2010 as the primary chemist. (Ex. 1A.) She found that Sample 1A contained cocaine, and recorded her findings on the accompanying control card. (Ex. 20.)
Ms. Dookhan’s initials appear on the GC/MS printouts as the GC/MS operator for the particular run that Sample 1A was on, i.e., run number G051210.S. (Hr’g. Tr. 23:2-6; 25:13-17 26:2-14; Ex. 4(1)-4(13); Ex. 20.) As Ms. Saunders was the GC/MS operator for the confirmatory analysis of the previous sample relating to Mr. Baez, Lab policy required Ms. Dookhan to show Ms. Saunders where the vial containing Sample 1A was placed on the GC/MS.[9] Like Ms. Corbett, Ms. Saunders found that Sample 1A was positive for the presence of cocaine. (Hr’g Tr. 27:3-8; Ex. 20.) Ms. Corbett and Ms. Saunders’s findings were reported on drug certificate number B10-01382, which states: “6 items were received and 1 was selected and analyzed,” and the analyzed item had a net weight of .57 grams and “contain[ed]: Cocaine, a derivative of Coca leaves, as defined in Chapter 94C, Controlled Substance Act, Section 31, Class B.” (Ex. 1A.) The Commonwealth based the possession charge against Mr. Baez on Sample 1A.
DISCUSSION
In support of his motion for a new trial, Baez argues that his guilty plea violates the Fourteenth Amendment of the United States Constitution and Article 14 of the Massachusetts Declaration of Rights because (1) his plea was not knowingly and voluntarily made, and (2) the Commonwealth failed to disclose to the defense exculpatory evidence concerning Ms. Dookhan’s misconduct. He further contends that this information concerning Ms. Dookhan’s misconduct constitutes newly discovered evidence, which warrants a new trial.
I. Motion for a New Trial Pursuant to Rule 30(b)
Under Mass.R.Crim.P. 30, this Court may grant a new trial at any time “if it appears that justice may not have been done.” Commonwealth, v. Desrosier, 56 Mass.App.Ct. 348, 353-54 (2002), quoting Mass.R.Crim.P 30(b), 378 Mass. 900 (1979). Moreover, “the judge’s disposition of the motion will not be reversed for abuse of discretion unless it is manifestly unjust...” Commonwealth v. Correa, 43 Mass.App.Ct. 714, 716 (1997) (citations omitted). “(S]ubstantial deference [is granted] to a decision denying a rule 30(b) *299 motion . . . when the judge passing on the motion is the same judge who heard the plea.” Commonwealth v. Grant, 426 Mass. 667, 672 (1998).
II. Knowing and Voluntary
“Due process requires that ‘a guilly plea should not be accepted, and if accepted must be later set aside,’ unless the contemporaneous record contains an affirmative showing that the defendant’s plea was intelligently and voluntarily made.” Commonwealth v. Furr, 454 Mass. 101, 106 (2009). Mr. Baez argues that this Court should vacate his guilly plea because it was not intelligently and voluntarily made. He does not contend that he lacked an understanding of either the elements of the charged offense or the consequences of pleading guilty, or that the plea proceedings themselves were infirm. See generally Commonwealth v. Robbins, 431 Mass. 442, 449 (2000). Rather, Mr. Baez argues that the evidence of Ms. Dookhan’s misconduct and of the other problems at the Lab renders the drug certificates in his case unreliable, and constitutes powerful impeachment evidence. See supra n.2, 3. Mr. Baez argues that because this evidence was unavailable to him when he entered his plea, he was unable to make a voluntary and intelligent plea.
Where, as here, the defendant was “warned of the usual consequences of pleading guilty and the range of potential punishment for the offense before entering a guilty plea[,]” he must show: (1) the government or its agents committed some egregiously impermissible conduct that antedated the entry of the plea; and (2) that the misconduct was material to the defendant’s choice to plead guilty. Ferrara v. United States, 456 F.3d 278, 290 (1st Cir. 2006). The Court need not reach the first issue, since even if the government’s alleged egregious conduct satisfied the first prong of the Ferrara test, clearly the misconduct in this case is not material to Mr. Baez’s plea of guilty.
Mr. Baez cannot successfully challenge his guilty plea as unknowing or involuntary simply by reciting details of Ms. Dookhan’s wrongdoing. Mr. Baez must also demonstrate that those details would have materially influenced his decision to plead guilty. See Ferrara, 456 F. 3d at 290. He must show that based on the totality of the circumstances, “a reasonable defendant standing in [Mr. Baez’s] shoes would likely have altered his decision to plead guilly” had he known about Ms. Dookhan’s misconduct. Id. at 294. In deciding whether to accept a plea agreement, such a defendant would consider the strength of the Commonwealth’s evidence against him and the sentence the defendant could potentially face if he were unsuccessful at trial. See Brady v. United States, 397 U.S. 742, 756 (1970). When determining “whether [a defendant such as Mr. Baez] would likely have altered his decision to plead guilty had the prosecution made a clean breast of the evidence in its possession!, ]” the Court can consider factors such as:
whether the . . . evidence would have detracted from the factual basis used to support the plea . . . whether the . . . evidence could have been used to impeach a witness whose credibility may have been outcome-determinative ... and . .. whether... the value of the . . . evidence was outweighed by the benefits of entering into the plea agreement. . .[10]
Ferrara, 456 F.3d at 294.
Here, Mr. Baez argues that this information aboutMs. Dookhan’s misconduct would have called into serious doubt the accuracy of the chemical analysis of Sample 1A, and as a result, would have undermined the Commonwealth’s ability to prove beyond a reasonable doubt that Sample 1A was in fact, cocaine. The charge reduction that Mr. Baez bargained for and received, however, was for the trafficking charge, which was the indictment that carried the harshest sentence.[11] Sample IB was the basis of the trafficking charge, and Ms. Dookhan’s name appears nowhere on the drug certificate relating to Sample IB (#B09-16530). Furtheimore, there is no evidence that Ms. Dookhan handled Sample IB or played any role in its testing or analysis. Since there is no evidence that Ms. Dookhan affected the test results of the sample relevant to the trafficking charge (Sample IB), evidence of her misconduct would not have been a material consideration in deciding whether to plead guilly to that charge.[12]
The Court is also not persuaded that this evidence of Ms. Dookhan’s misconduct would have altered Mr. Baez’s decision to plead guilty to the possession charge even though Ms. Dookhan was tangentially involved in the testing of the relevant sample (Sample 1A). Because Ms. Dookhan was not the primary chemist, she never had custody of the bulk sample. She was not responsible for making up the vial, and she received no credit in any data reports for any work she did concerning Sample 1A. Because she was not the confirmatory chemist, she was not responsible for analyzing any of the mass spec data related to Sample 1 A, or confirming the findings of the primary chemist.
As the GC/MS operator, Ms. Dookhan’s only role was to place the sealed vial, which Ms. Corbett made, onto the GC/MS. There was no incentive for Ms. Dookhan to inflate the number of samples she worked on as the GC/MS operator because only the assigned primary chemists received credit on production data reports for the work they performed on the samples. Thus, to the extent that Ms. Dookhan was motivated to have others perceive her as a productive employee,[13] tampering with vials of samples as a GC/MS operator would not accomplish that goal.
In addition, there is no evidence in the record from which the Court could conclude that Ms. Dookhan, as the GC/MS operator, was in a position to compromise the test results of Sample 1A. In that role, she was required to show the vial and its placement on the GC/MS to Ms. Saunders, the confirmatory chemist, and give her all of the paperwork necessaiy to perform an independent analysis of Sample 1A. It is theoretically possible that Ms. Dookhan could have incorrectly set up the GC/MS run by tampering with the QC mix, the *300 reagent, or the known sample. However, according to Ms. Saunders’s testimony, which this Court credits, since all of the chemists used the same stock of reagent, any tampering with the reagent would have been detected because it would have affected all of the other chemists who used the reagent. (See Hr’g Tr. at 50:14-18.)
Additionally, any contamination of the known sample, reagent, or QC Mix would have been detected by Ms. Saunders when she examined the resulting mass spec data on the GC/MS-generated printouts. Ms. Dookhan’s co-worker, Dan Renczowski, corroborates this statement, as he informed the police that in other situations, he was able to determine, by checking the peaks shown on the GC/MS paperwork, that Ms. Dookhan had improperly run the QC Mix on the GC/MS and recorded false data on the accompanying paperwork. (See Ex. 19 at 8 par. 13.)
Most importantly, the record contains compelling circumstantial evidence that supports that both samples (Sample 1A and Sample IB) were cocaine. See Commonwealth. v. King, 461 Mass. 354, 357 (2012), quoting Commonwealth v. Dawson, 399 Mass. 465, 467 (1987) (“Proof that a substance is a particular drug ‘may be made by circumstantial evidence’ ”). Detectives Doyle and Brennan and Sergeant Hanson observed Mr. Baez attempt to flee and swallow a plastic bag containing a white chunk, which he spit out only after the officers struggled with and sprayed him with pepper spray. Cf. Commonwealth v. Rodriguez, 75 Mass.App.Ct. 235, 240 (2009) (holding that officers had probable cause to arrest defendant because “they observed the defendant attempting to swallow something” and, “(b)ased on their training and experience, [they] reasonably believed that the defendant was trying to swallow narcotics”).
Additionally, Lieutenant Cote searched the House with a drug-sniffing dog, which detected the presence of narcotics in Mr. Baez’s bedroom. See Commonwealth v. Harris, 75 Mass.App.Ct. 696, 707 (2009) (including among circumstantial evidence that weighed in favor of finding that substance was cocaine the fact that “canine used in the search made a positive hit, which directly led the officers to the cocaine”).
The House also contained an array of items commonly associated with narcotics distribution, including: a large amount of cash; cutting agents; firearms; packaging equipment; cell phones; and drug records. See, e.g., Commonwealth v. DePina, 75 Mass.App.Ct. 842, 852-53 (2009) (finding “considerable circumstantial evidence indicat[ing] that the rocks were cocaine” including “their proximity to distribution paraphernalia” such as “cut sandwich bags, baking soda, and razor blades”). Both the chunk seized from Mr. Baez and the six plastic twists of white powder were packaged in a manner consistent with cocaine. See, e.g., Commonwealth v. MacDonald, 459 Mass. 148, 153(2011) (citation omitted) (notingthat “packaging” is one factor that may contribute to finding that substance was cocaine). But see Commonwealth v. Perez, 76 Mass.App.Ct. 439, 444 n.4 (2010) (suggesting that “form of packaging” alone is insufficient to prove “that a substance is a particular drug’).
The strength of the Commonwealth’s case against Mr. Baez, together with the potential sentence he faced, the significant charge reduction he received in exchange for his plea, and the extreme unlikelihood that Ms. Dookhan tainted any of the drug samples in his case overwhelmingly suggest that Mr. Baez would not have changed his plea even if he had known of Ms. Dookhan’s misconduct at the Lab.
III. Newly Discovered Evidence
Mr. Baez also urges this Court to vacate his guilty plea on the ground that Ms. Dookhan’s misconduct at the Lab is newly discovered exculpatory evidence. “A defendant seeking a new trial on the ground of newly discovered evidence must establish . . . that the evidence is newly discovered and that it casts real doubt on the justice of the conviction.” Commonwealth v. Grace, 397 Mass. 303, 305 (1986) (citation omitted). Evidence is “newly discovered” if it was “unknown to the defendant or his counsel and not reasonably discoverable by them at the time of [the defendant’s plea].” Id. at 306. Here, there is no evidence that either Mr. Baez or his attorney was aware of Ms. Dookhan’s misconduct or the problems at the Lab, or that her misconduct had been discovered at the time of the plea. Therefore, this evidence qualifies as “newly discovered.”
To constitute an appropriate basis for a new trial, however, newly discovered evidence “not only must be material and credible . . . but also must carry a measure of strength in support of the defendant’s position.” Grace, 397 Mass. at 305 (citations omitted). Newly discovered evidence is material only if it is “weighfy and of such nature as to its credibility, potency, and pertinency to fundamental issues in the case as to be worthy of careful consideration.” Commonwealth v. Brown, 378 Mass. 165, 171 (1979) (citation omitted). Moreover, “[t]he strength of the case against a criminal defendant . . . may weaken the effect of evidence which is admittedly newly discovered.” Grace, 397 Mass. at 306 (citation omitted).
As discussed supra Part II, Ms. Dookhan’s involvement with one sample in Mr. Baez’s case was non-existent, and extremely limited with the other sample. Ms. Corbett and Ms. Saunders performed all of the testing and analysis on Sample IB, and there is nothing in the record that suggests that their testing practices were in any way questionable. Additionally, no evidence was presented that Ms. Dookhan tampered with or even handled that sample. As such, her misconduct, as described in the record, has no bearing on the accuracy of the testing and analysis of Sample IB.
In addition, although Ms. Dookhan was the GC/MS operator for Sample 1A, there is no evidence that this role allowed her to tamper with the vial without being detected or that she actually did so in this case. On the contrary, Ms. Corbett achieved a positive prelimi *301 nary test result on Sample 1A even before the vial was sent to Ms. Dookhan for placement on the GC/MS. Ms. Saunders subsequently corroborated that positive test result when she analyzed the GC/MS-generated data. Given Ms. Dookhan’s insignificant role in the testing of Sample 1A and the absence of any evidence that she tampered with that sample, the Court cannot conclude from the evidence of Ms. Dookhan’s prior misconduct that she affected the analyses performed by Ms. Corbett and Ms. Saunders on Sample 1A. Thus, this newly discovered evidence about Ms. Dookhan’s misconduct is not sufficiently weighty, potent, or pertinent to the fundamental issues of this case to be worthy of consideration at a new trial. See Brown, 378 Mass, at 171. Cf. Hollingsworth, 68 Mass.App.Ct. at 1109, 2007 WL 609802 at *3 (Mass.App.Ct. 2007) (unpublished opinion pursuant to Rule 1:28) (citation and internal quotation marks omitted) (affirming judge’s conclusion that newly discovered evidence of police officer’s falsification of complaints in an unrelated matter “was not potent, pertinent, and creditworthy to fundamental issues in [the defendant’s] case” where facts written in the officer’s police report could have been corroborated by other officers).
The evidence about the general mismanagement and about the other problems at the Lab is similarly newly discovered, but immaterial in this case. The seriousness of these lapses in management and Lab protocol cannot be overstated. Yet there is no evidence that any of these problems were specifically related to the particular samples involved in Mr. Baez’s case. Any suggestion that his samples were tainted as a result of these problems is merely conjecture.
Moreover, the overwhelming strength of the Commonwealth’s case against Mr. Baez weakens any effect that the newly discovered evidence concerning Ms. Dookhan and the Lab may have had on Mr. Baez’s case. Had this case gone to trial, the Commonwealth likely could have presented the testimony of Ms. Corbett, Ms. Saunders, Detective Doyle, Detective Brennan, and Sergeant Hanson, all of whom likely would have testified to facts strongly suggesting that the recovered substance was cocaine. Considering the substantial amount of evidence that the Commonwealth possessed against Mr. Baez, it is highly doubtful that this newly discovered evidence about Ms. Dookhan and the Lab would have been so significant that had it been presented at trial, it “would probably have been a real factor in the jury’s deliberations . . .” Grace, 397 Mass. at 306. See also Hollingsworth 68 Mass.App.Ct. 1109, 2007 WL 609802 at *3 (“A motion for a new trial should only be granted if the newly discovered evidence is of such importance that it presumably would have had a genuine effect on the proceedings”). Thus, the Court finds that this new evidence concerning the various shortcomings of the Lab is not sufficiently material to the fundamental issues of this case to warrant a new trial.
IV. Brady v. Maryland
Finally, Mr. Baez seeks to withdraw his guilty plea on due process grounds under Brady v. Maryland, 373 U.S. 83 (1963). “Due process is violated if the government withholds evidence that is both exculpatory and material to the issue of the defendant’s innocence.” Commonwealth v. Vaughn, 32 Mass.App.Ct. 435, 439 (1992) (citation omitted). Even assuming that the Commonwealth had a duty to disclose this evidence about Ms. Dookhan’s misconduct and the other problems at the Lab[14] and that such evidence is exculpatory, Mr. Baez cannot prevail on this basis because he has not shown that he was prejudiced by the nondisclosure. Commonwealth v. Brown, 57 Mass.App.Ct. 852, 855 (2003) (“The defendant must establish that he was prejudiced by the nondisclosure”).
As discussed supra Parts II and III, the undisclosed evidence is immaterial to the accuracy of the independent chemical analyses of Samples 1A and IB by Ms. Corbett and Ms. Saunders. Thus, such evidence “does not carry a measure of strength in support of the defendant, [and] the failure to disclose that evidence does notwarrantthe granting of anewtrial.” Common-wealthv. Tucceri, 412 Mass. 401, 414 (1992). See also Commonwealth v. Olszewski, 416 Mass. 707, 714 (1993) (“A defendant claiming to have been deprived of potentially exculpatory evidence has the... burden of establishing a reasonable possibility, based on concrete evidence and not mere speculation, that the Commonwealth’s actions deprived him of evidence that would have been favorable to his case”). Accordingly, the Court finds that the undisclosed information about Ms. Dookhan and the problems at the Lab are immaterial to the issue of Mr. Baez’s innocence.
V. Conclusion
There is no doubt that this newly discovered evidence about Ms. Dookhan and the Lab should have been made available to Mr. Baez at the time he entered his plea. As horrific and unconscionable the allegations are involving Ms. Dookhan’s conduct, a motion for a new trial may not be granted based upon speculation. More is required than to pound the table and yell “Annie Dookhan.”
Nonetheless, the Court recognizes the possibility that there are circumstances when a defendant might successfully challenge his guilty plea based on the newly discovered evidence about Ms. Dookhan and the Lab when Ms. Dookhan was the confirmatory chemist or played a lesser role in the defendant’s case. Such a result, however, will depend on the totality of the circumstances of each case, and will require a showing based on record evidence rather than mere speculation that Ms. Dookhan’s appalling wrongdoing and /or the problems at the Lab affected the chemical analysis on that defendant’s drug cerüficate(s). Mr. Baez has failed to make such a showing. Therefore, his motion will be denied.
*302 ORDER
For the foregoing reasons, and after hearing, the defendant’s motion for a new trial (paper #35) is DENIED.

The Court treats the Motion as a motion for new trial pursuant to Mass.RCrim.P. 30(b). See Commonwealth v. Pingaro, 44 Mass.App.Ct. 41, 47-48 (1997) (treating defendant’s motion to withdraw guilty pleas as motion for new trial pursuant to Mass.R.Ciim.P. 30(b)).

Ihe record submitted for this hearing reveals the following about Ms. Dookhan’s alleged misconduct. Ms. Dookhan has been indicted in multiple counties for perjury, obstruction of justice, evidence tampering, and falsely claiming to hold a masters degree (Ex. 9; Ex. 19 at 29-30 par. 15; Ex. 10 at 32-33). Ms. Dookhan has admitted to “dry labbing” (Ex. 19 at 73 pars. 7, 10; Ex. 19 at 77 par. 2; Ex. 10 at 22, 24-26; Ex. 8 par. 2; Ex. 19 at 24 par. 16); that is, falsely certifying that she had tested drug samples, when she had only identified them visually. (Ex. 19 at 23 par. 8; Ex. 19 at 73 par. 7; Ex. 10 at 21-23.) Her unusually high level of production was inconsistent with the level required to perform the tests properly. (Ex. 19 at 19-20 pars. 4-7; Ex. 19 at 14 pars. 5-7; Ex. 19 at 21 par. 1; Ex. 19 at 50 par. 8.)
Ms. Dookhan admitted that she covered up her dry-labb-ing by intentionally contaminating samples with a known drug sample to turn negative test results into positive ones. (Ex. 19 at 73 par. 9; Ex. 19 at 77, par. 2; Ex. 8, par. 2; Ex. 10 at 23-24, Ex. 10 at 26.)
Ms. Dookhan also admitted that in June 2011, she removed ninety samples from the evidence office (Ex. 19 at 71-72 pars. 2-3; Ex. 10 at 10-11, Ex. 10 at 18-19); and she postdated, filled out, and forged the initials of an evidence officer in the evidence log book (Ex. 19 at 72 par. 3; Ex. 19 at 77 par. 2; Ex. 8 par. 2; Ex. 10 at 19, 25). Ms. Dookhan further admitted that she forged another chemist’s initials on a tune report (Ex. 19 at 72 par. 4; Ex. 19 at 15 par. 9; Ex. 19 at 40 par. 3; Ex. 10 at 19-20), and falsified data on a Quality Control GC/MS Daily Injector Report (Ex. 19 at 72 par. 5; Ex. 19 at 22 par. 5; Ex. 10 at 20). She has also been accused of forging another chemist’s initials on batch sheets (Ex. 19 at 45 par. 2); and forging a co-worker’s signature on a control sheet. (Ex. 12 at 12-13; Ex. 19 at 5-6 pars. 2-3.) Additionally, Ms. Dookhan admitted that she regularly accessed the evidence database to look up data for Assistant District Attorneys who would call her directly, against proper protocol. (Ex. 19 at 24 par. 14; Ex. 19 at 32 par. 8; Ex. 19 at 34 par. 2; Ex. 19 at 40 par. 5; Ex. 19 at 72 par. 6; Ex. 10 at 20-21.) Ms. Dookhan was accused of other types of questionable testing practices at the Lab, including: measuring samples before balancing her scale (Ex. 19 at 23 par. 9; Ex. 19 at 31 par. 2; Ex. 19 at 42 par. 4); improperly training employees (Ex. 19 at 31-32 par. 3); correcting her own mistakes without first viewing the necessary paperwork (Ex. 19 at 7 par. 11); leavingmass/spec vials uncapped and exposed to the air on the rack (Ex. 19 at 7-8 par. 12); opening and closing the Lab (Ex. 19 at 32, par. 7; Ex. 19 at 42 par. 4); entering the Lab, the evidence room, and the mass spec area without proper authorization; and retrieving “discovery” data without proper authorization. (Ex. 19 at 35 par. 6; Ex. 19 at 40 par. 5; Ex. 19 at 46 par. 5.)

The state police investigation of the Lab revealed many other problems. The Lab was not accredited. (Ex. 13at 6:14-16.) The Lab’s procedures restricting access to the evidence room and safe were disregarded. (Ex. 19 at 28 par. 6.) For example, the safe was accessible by codes and keys that had not been changed since 2003 or 2004. (Ex. 19 at 28, par. 3.) It was later discovered that all of the keys could open the safe door. (Ex. 19 at 38 par. 11; Ex. 19 at 26 par. 4; Ex. 19 at 46 par. 6.) At times, the safe door was left propped open and unattended. (Ex. 19 at 28 par. 6; Ex. 19 at 35 par. 5.) During a police investigation of the Lab that took place in early 2013, drug samples were discovered in locations outside of the evidence safe. (Ex. 17; Ex. 18.) For example, miscellaneous samples were marked as having been found on the floor (Ex. 18), found in a lab desk cabinet (Ex. 18), in a lab bench drawer (Ex. 17), in a filing cabinet (Ex. 18), in an office desk drawer (Ex. 17; Ex 18), and in a drying hood cabinet (Ex. 18). One of the unknown samples had labels with very old dates. (Ex. 18 at 2-3.)

Mr. Baez was not charged with any offense for the nine pills found in his bedroom closet. (See Hr’g Tr. 6:24-25.)

A11 of the chemists have access to shared supplies of unopened vials, reagent, and crimpers. (Hr’g. Tr. 46:2-47:21.) They also keep their own supply of these items at their workstations. (Hr’g Tr. 46:2-47:21.) If the reagent is compromised, the rest of the chemists using the reagent would notice, andanewbatch would be ordered. (Hr’gTr. 50:14-18.)

For purposes of clarity, the Court refers to the confirma-toiy chemist assigned to the GC/MS lab as the GC/MS operator.

The vials are placed on the GC/MS in the following pattern: blank, blank, known standard, blank, sample to be tested, blank, sample to be tested, blank, sample to be tested. (Hr’g Tr. 35:13-19.) This pattern repeats itself every ten samples. (Hr’gTr. 35:18-20.) The GC/MS operator records the placement of each vial on a numbered GC/MS batch sheet. (Hr’g Tr. 34:20-23.)

These reports track the number of samples analyzed by each chemist. (See Hr’gTr. 27:14-19; 51:1-15.)

Nothing in the record indicates whether Ms. Dookhan did or did not follow this policy.

Other factors which are set forth in Ferrara, but inapplicable on these facts include: “whether the ... evidence was cumulative of other evidence already in the defendant’s possession . . . whether the . . . evidence would have influenced counsel’s recommendation as to the desirability of accepting a particular plea bargain . . .” Ferrara, 456 F.3d at 294.

Mr. Baez faced a minimum sentence of five years and possibly as much as twenty years for the original trafficking indictment. See G.L.c. 94C, §32E(b)(2) (as in effect in 2011). Though he could have received a sentence of up to ten years on the possession charge, he faced no mandatory minimum sentence on that charge, and could have been sentenced to as little as two and a half years in a house of correction. G.L.c. 94C, §32A(a) (as in effect in 2011).

Although Ms. Dookhan had unauthorized access to the evidence office and other areas of the Lab, there is no evidence that she ever tampered with samples other than those assigned to her as a primary chemist. Any suggestion that she did so with respect to Sample IB would be purely speculative. Moreover, because Ms. Dookhan had no role whatsoever concerning Sample IB, it is highly unlikely that she could have tampered with the vial without being detected by Ms. Saunders, the assigned confirmatory chemist. (See Hr’gTr. at 49:10-22.)

Ms. Dookhan was well known among her colleagues as a highly productive worker. (Ex. 19 at 19 par. 7; Ex. 19 at 39 par. 1.) One of Ms. Dookhan’s co-workers, Hevis Lleshi, suggested that Ms. Dookhan received special privileges because of her high level of productivity. (See Ex. 19 at 32 par. 8.) Lab Supervisor Elizabeth O’Brien further speculated that Ms. Dookhan took samples without logging them out because she “was trying to be important, by being the ‘go-to’ person.” (Ex. 19 at 29 par. 10.)

Although the Court does not address the issue in this decision, the Court notes that the case law suggests that the Commonwealth had such a duty. See Commonwealth v. Martín, 427 Mass. 816,823-24 (1998) (holding that the Commonwealth had the “duty to inquire” about and disclose to the defense the results of confirmatory tests conducted by the State police laboratory even though those results were “held by the . . . laboratory and ... known only to one of its chemists”).